**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

BRYAN ADRAIN COPELAND,

        Petitioner,

vs.                              Case No.:    3:16-cv-699-J-34JBT
                                                    3:11-cr-281-J-34JBT

UNITED STATES OF AMERICA,

        Respondent.

_____/

## ORDER

This case is before the Court on Petitioner Bryan Adrain Copeland's pro se Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (Civ. Doc. 1; Motion to Vacate), Memorandum in Support (Civ. Doc. 2; Memorandum), and Affidavit (Civ. Doc. 2-1; Affidavit).[1] Copeland alleges that he pled guilty because counsel misadvised him about his potential sentence. Copeland also raises three claims that counsel gave ineffective assistance at his sentencing. The United States filed an initial response (Civ. Doc. 7; Response) and Copeland filed a counseled reply (Civ. Doc. 12; Reply). After reviewing the initial briefs, the Court ordered the United States to file a supplemental response, which the Court has received (Civ. Doc. 16; Supplemental Response) along with Copeland's counseled supplemental reply (Civ. Doc. 17; Supplemental Reply). Thus, the matter is ripe for a decision.

---

[1] Citations to the record in the underlying criminal case, United States vs. Bryan Adrain Copeland, No. 3:11-cr-281-J-34JBT, are denoted as "Crim. Doc. __." Citations to the record in the civil § 2255 case, No. 3:16-cv-699-J-34JBT, are denoted as "Civ. Doc. __." Citations to page numbers refer to the number designated by CM/ECF.

Pursuant to 28 U.S.C. § 2255 and Rule 8(a) of the Rules Governing Section 2255 Proceedings[2], the Court has considered the need for an evidentiary hearing and determines that a hearing is not necessary to resolve the merits of this action. See Rosin v. United States, 786 F.3d 873, 877 (11th Cir. 2015) (an evidentiary hearing on a § 2255 motion is not required when the petitioner asserts allegations that are affirmatively contradicted by the record or patently frivolous, or if in assuming the facts that he alleges are true, he still would not be entitled to any relief); Patel v. United States, 252 F. App'x 970, 975 (11th Cir. 2007).[3] For the reasons set forth below, Copeland's Motion to Vacate is due to be denied.

## I.    Background

On November 10, 2011, a grand jury sitting in the Middle District of Florida returned a thirty-eight-count indictment, charging Copeland with eleven counts of mail fraud in violation of 18 U.S.C. § 1341 (Counts One through Eleven), sixteen counts of wire fraud in violation of 18 U.S.C. § 1343 (Counts Twelve through Twenty-Seven), nine counts of aggravated identity theft in violation of 18 U.S.C. § 1028A (Counts Twenty-Eight through Thirty-Six), and two counts of making false claims against the United States in violation of 18 U.S.C. § 287 (Counts Thirty-Seven and Thirty-Eight). (Crim. Doc. 1; Indictment). On February 15, 2012, Copeland pled guilty to Counts Twenty-Seven, Thirty-Six, and Thirty-Seven pursuant to a written Plea Agreement. (Crim. Doc. 42; Plea Agreement); (Crim.

---

[2]    Rule 8(a) of the Rules Governing Section 2255 Proceedings expressly requires the Court to review the record, including any transcripts and submitted materials, to determine whether an evidentiary hearing is warranted before resolving a § 2255 motion.

[3]    Although the Court does not rely on unpublished opinions as precedent, they may be cited throughout this Order as persuasive authority on a particular point. Rule 32.1 of the Federal Rules of Appellate Procedure expressly permits the Court to cite to unpublished opinions that have been issued on or after January 1, 2007. Fed. R. App. P. 32.1(a).

Doc. 81; Plea Tr.). In doing so, Copeland admitted committing wire fraud, committing aggravated identity theft, and making false claims against the United States. Specifically, Copeland admitted that between May 2006 and January 2010, he engaged in a scheme to defraud the Internal Revenue Service (IRS) by using stolen identities to submit fraudulent tax returns via mail and electronic filing. Plea Agreement at 20-22, 23-26; Plea Tr. at 28-33.

On June 18, 2012, the Court sentenced Copeland to a total term of imprisonment of 264 months, consisting of 240 months as to Count Twenty-Seven, a concurrent term of 60 months in prison as to Count Thirty-Seven, and a consecutive term of 24 months in prison as to Count Thirty-Six, which by statute had to run consecutively with the sentence for the other two counts.[4] (See Crim. Doc. 84; Sentencing Tr.); (Crim. Doc. 65; Judgment). Copeland appealed the sentence, "argu[ing], inter alia, that the government breached the plea agreement by failing to recommend a three-level guideline reduction under U.S.S.G. § 3E1.1 for acceptance of responsibility." United States v. Copeland, 520 F. App'x 822, 823 (11th Cir. 2013). The Eleventh Circuit agreed with Copeland that the government breached the Plea Agreement to the extent it failed to recommend a two-level reduction under § 3E1.1(a), id. at 826-27, and remanded the case for resentencing before a different judge, id. at 828.

Following remand, the Probation Office prepared a revised Presentence Investigation Report (Revised PSR) in advance of the resentencing hearing. For purposes of calculating the offense level, Counts Twenty-Seven and Thirty-Seven were grouped together "pursuant to U.S.S.G. § 3D1.2(d) because the offense level [was] determined

---

[4]     See 18 U.S.C. § 1028A(b)(2).

largely on the basis of the total amount of loss and the offense guideline is written to cover such behavior." Revised PSR at ¶ 37. Count Thirty-Six, which carried a two-year mandatory consecutive sentence, was grouped separately. See id. at ¶ 38. According to the Revised PSR, the total offense level for Counts Twenty-Seven and Thirty-Seven was 38 and Copeland's Criminal History Category was I. Revised PSR at ¶¶ 40-51, 57. The total offense level consisted of a base offense level of 6 under U.S.S.G. § 2B1.1(a)(2); an 18-level enhancement under § 2B1.1(b)(1)(J) because the loss was more than $2.5 million but not more than $7 million; a 6-level enhancement under § 2B1.1(b)(2)(C) because the offense involved more than 250 victims; a 2-level enhancement under § 2B1.1(b)(10)(C) because the offense involved sophisticated means; a 2-level enhancement under § 3A1.1(b)(1) because the offense involved a vulnerable victim; a 4-level enhancement under § 3B1.1(a) because Copeland was an organizer or leader of criminal activity; a 2-level enhancement under § 3C1.1 for obstruction of justice; and a 2-level reduction under § 3E1.1(a) for acceptance of responsibility. The Guidelines calculation yielded an advisory sentencing range of 235-293 months in prison as to Counts Twenty-Seven and Thirty-Seven, plus the 24-month consecutive term of imprisonment as to Count Thirty-Six. (Crim. Doc. 144; Resentencing Tr. Vol. II at 12). The Court varied well below the Guidelines range, imposing a total term of imprisonment of 204 months. Id. at 53. The prison sentence consisted of 180 months as to Count Twenty-Seven, a concurrent term of 60 months as to Count Thirty-Seven, and a consecutive term of 24 months as to Count Thirty-Six. Id.; (see also Crim. Doc. 135; Judgment on Resentencing). The Court also sentenced Copeland to a total of 3 years of supervised release following the term of imprisonment and ordered him to pay approximately $3.5 million in restitution. Judgment on Resentencing at 3, 5.

Copeland again appealed his sentence, this time arguing that the Court erred by applying a Guidelines enhancement for obstruction-of-justice. United States v. Copeland, 604 F. App'x 834, 835 (11th Cir. 2015). The Eleventh Circuit rejected Copeland's argument and affirmed his conviction and sentence. Id. at 838. Copeland did not seek certiorari review before the Supreme Court. Thereafter, Copeland timely filed the instant Motion to Vacate, raising four claims of ineffective assistance of counsel.[5]

## II.    Discussion

Pursuant to Title 28, United States Code, Section 2255, a person in federal custody may move to vacate, set aside, or correct his sentence. Section 2255 permits such collateral challenges on four specific grounds: (1) the imposed sentence was in violation of the Constitution or laws of the United States; (2) the court did not have jurisdiction to impose the sentence; (3) the imposed sentence exceeded the maximum authorized by law; or (4) the imposed sentence is otherwise subject to collateral attack. 28 U.S.C §2255(a) (2008). Only jurisdictional claims, constitutional claims, and claims of error that are so fundamentally defective as to cause a complete miscarriage of justice will warrant relief through collateral attack. United States v. Addonizio, 442 U.S. 178, 184-86 (1979). A petitioner's challenge to his sentence based on a Sixth Amendment claim of ineffective assistance of counsel is normally considered in a collateral attack. United States v. Teague, 953 F.2d 1525, 1534 n. 11 (11th Cir. 1992).

To establish ineffective assistance of counsel, a § 2255 petitioner must demonstrate both: (1) that his counsel's conduct amounted to constitutionally deficient performance,

---

[5]    As discussed below, however, Copeland appears to have abandoned Ground Three.

and (2) that counsel's deficient performance sufficiently prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); Weeks v. Jones, 26 F.3d 1030, 1036 (11th Cir. 1994). In determining whether the petitioner has satisfied the first requirement, i.e. that counsel performed deficiently, the Court adheres to the standard of reasonably effective assistance. Weeks, 26 F.3d at 1036. The petitioner must show that, in light of all the circumstances, counsel's performance fell outside the "wide range of professionally competent assistance." Id. To satisfy the second requirement, that counsel's deficient performance was prejudicial, the petitioner must show that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. Id. at 1036-37 (citing Strickland, 466 U.S. at 694). In determining whether a petitioner has met the two prongs of deficient performance and prejudice, the Court considers the totality of the evidence. Strickland, 466 U.S. at 695. However, because both prongs are necessary, "there is no reason for a court… to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697; see also Wellington v. Moore, 314 F.3d 1256, 1261 n. 1 (11th Cir. 2002) ("We need not discuss the performance deficiency component of [petitioner's] ineffective assistance claim because failure to satisfy the prejudice component is dispositive.").

Strickland's two-part test applies to claims of ineffective assistance arising out of the plea negotiation process. Hill v. Lockhart, 474 U.S. 52, 57 (1985). Thus, a prisoner alleging ineffective assistance of counsel based on his attorney's performance during the plea process must show two things: (1) that his attorney's advice fell below an objective standard of reasonableness, and (2) a reasonable probability that the outcome of the plea

process would have been different with competent advice. <u>Lafler v. Cooper</u>, 132 S. Ct. 1376, 1384 (2012) (citation omitted).

## A. Ground One

In his first ground, Copeland argues that he "received ineffective assistance of counsel during plea negotiations when counsel promised an unrealistically low sentence in order to induce a guilty plea that otherwise would not have been entered." Motion to Vacate at 4. Specifically, Copeland alleges that:

> (1) Counsel "advised him that the maximum sentence he could receive under the plea agreement was 84 months imprisonment" and that he would likely receive a sentence "in the range of 60 months imprisonment." Memorandum at 10; <u>see also</u> Affidavit at ¶ 2. Counsel purportedly failed to advise Copeland that he could be sentenced to over 200 months in prison.

<u>See</u> Memorandum at 10.

> (2) Counsel failed to advise him how the loss amount would be calculated under the United States Sentencing Guidelines, and failed to advise him of the possibility that he could be subject to Guidelines enhancements "that were not addressed in the plea agreement."

Memorandum at 10-11; <u>see also</u> Affidavit at ¶ 3.

> (3) Counsel advised him "that a verbal agreement had been reached [with the government] concerning his sentence and that the Guidelines would not be used," but instead that a "3rd party mitigator" named Carlos Dawson "would be used to determine the appropriate sentence."

Memorandum at 11; <u>see also</u> Affidavit at ¶ 3. Copeland alleges that counsel's advice rendered his guilty plea unknowing, involuntary, and unintelligent. Memorandum at 8. He further contends that "[h]ad Petitioner been correctly advised by counsel concerning his potential penalty, he would never have entered the plea agreement." <u>Id.</u> at 12; Affidavit at ¶ 4.

The record refutes each of Copeland's allegations. Beginning with the Plea Agreement, the Court notes that contrary to Copeland's assertion that he believed the maximum sentence was 84 months (7 years) in prison, a section titled "Maximum Penalties" specifically advised him that the cumulative maximum penalty for Counts Twenty-Seven, Thirty-Six, and Thirty-Seven was 27 years in prison, two years "of which are mandatory consecutive to any sentence of imprisonment imposed pursuant to Count Twenty-Seven." Plea Agreement at 3. By signing the Plea Agreement, Copeland acknowledged that he understood that regardless of any recommendations made by the government, "the sentence w[ould] be determined solely by the Court, with the assistance of the United States Probation Office." Id. at 15. Thus, Copeland could not have believed that his sentence would be determined by a "3rd-party mitigator" or based on some alleged verbal agreement with the government.

Moreover, contrary to Copeland's assertion that he was unaware any enhancements could be applied that were not addressed in the Plea Agreement, the Plea Agreement contained a section titled "Sentencing Information":

> 3.  **Sentencing Information**
>
> The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the counts to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

Id. at 14. Thus, Copeland understood that the government could bring any information to the attention of the Court that was relevant to his background, personal and offense

characteristics, and conduct or criminal activities. Finally, Copeland acknowledged that he was not relying on any "promise of benefit of any kind" other than those contained in the Plea Agreement itself, id. at 17, and that the written Plea Agreement constituted the entirety of the agreement, id. at 19. These provisions contradict Copeland's claim that he relied on counsel's alleged assurance that counsel and the government had reached a verbal agreement about the sentence.

At the change-of-plea colloquy, Copeland stated under oath that he had read and understood every provision of the Plea Agreement, that he had signed the agreement, and that he had initialed each page. Plea Tr. at 21-22. Copeland's attorney confirmed as well that he had reviewed the Plea Agreement with Copeland. Id. at 21. After advising Copeland of his rights, the Court advised Copeland about the applicability of the United States Sentencing Guidelines, the unpredictability of his sentence, and the Court's authority to impose any sentence up to the statutory maximum:

> THE COURT: Now, the federal sentencing guidelines apply to your case, Mr. Copeland. Have you had an opportunity to discuss the sentencing guidelines with your lawyer?
>
> DEFENDANT: Yes, sir.
>
> THE COURT: I'm not going to go into great detail about the guidelines because you've already discussed them with your lawyer, but I do want to make sure that you understand certain things about how the sentencing process works.
>
> The Court will not be able to determine what your guideline sentence is until after the presentence report has been prepared by the probation department. After it has been determined what guidelines apply to your case, I have the authority to impose a sentence that is more severe or less severe than the sentence called for by the guidelines. I have the authority, under certain circumstances, to depart or vary from the guidelines and

> sentence you either to a lower sentence or a higher sentence than the one called for by the guidelines.
>
> I am required to consider the guidelines, but I have the authority to impose any sentence up to and including the maximum penalty permitted by law. This means that the Court is not bound by the guidelines in setting your sentence, but rather, that the guidelines are only advisory in nature.
>
> Understood?
>
> DEFENDANT: Yes, sir.

Plea Tr. at 14. The Court further cautioned Copeland not to rely on any sentencing estimate provided by his lawyer:

> THE COURT: .... The sentence that is imposed may be different than any estimated sentence that your lawyer or anybody else has given you. In fact, it may be more severe than you expect. If that happens you will still be bound by your plea and will not have the right to withdraw it.
>
> Do you understand that?
>
> DEFENDANT: Yes, sir.
>
> THE COURT: Do you understand all the things that I've just explained to you about sentencing?
>
> DEFENDANT: Yes, sir.

Id. at 15. After reviewing the maximum sentence for each count, id. at 17-18, the Court reminded Copeland that "[t]he maximum penalties for Counts Twenty-Seven, Thirty-Six, and Thirty-Seven accumulate to not more than 27 years imprisonment, two of which are mandatory consecutive to any sentence of imprisonment imposed pursuant to Count Twenty-Seven…," id. at 19. Copeland affirmed that he understood the maximum sentence and that the "maximum penalties are the logical consequence of [his] guilty plea." Id. at 20.

After the Court reviewed the charges and the factual basis in open Court with Copeland, and after Copeland affirmed that the factual basis was true, Copeland assured the Court that his guilty plea was not induced by any promises or threats:

> THE COURT: Has anyone threatened you, forced you, coerced you, or intimidated you in any way regarding your decision to plead guilty?
>
> DEFENDANT: No, sir.
>
> THE COURT: Has anyone made any promises or assurances to you of any kind in order to induce you to plead guilty, other than the terms contained in your plea agreement?
>
> DEFENDANT: No, sir.

Id. at 36. Notably, Copeland specifically assured the Court that he did not know what his sentence would be, and that he was not relying on any promise of a particular sentence:

> THE COURT: Are you relying on any agreement, promise, or understanding with anyone concerning what sentence will be imposed if you plead guilty other than what's contained in the terms of your plea agreement?
>
> DEFENDANT: No, sir.
>
> THE COURT: And at this time do you know what sentence you will receive?
>
> DEFENDANT: Do I know what sentence –
>
> THE COURT: Yes, sir.
>
> DEFENDANT: – I will receive?
>
> No, sir.
>
> THE COURT: Has anyone promised you that you will receive a light sentence or be otherwise rewarded for pleading guilty, other than the terms contained in your plea agreement?
>
> DEFENDANT: No, sir.

> THE COURT: Mr. Stripling, as counsel for the defendant, can you assure the Court that as far as you know, there have been no assurances, promises, or understandings given to Mr. Copeland as to a disposition of his case different or contrary to what's contained in the plea agreement?
>
> MR. STRIPLING: Yes, sir, I can acknowledge that.
>
> THE COURT: All right. Ms. O'Malley, on behalf of the United States?
>
> MS. O'MALLEY: Yes, Your Honor.

Id. at 36-37. Copeland advised the Court that he was satisfied with his attorney's representation and confirmed that it was his desire to plead guilty to Counts Twenty-Seven, Thirty-Six, and Thirty-Seven, id. at 37-38, and the Court accepted his plea as knowingly and voluntarily made, id. at 39.

Copeland's sworn statements during the plea colloquy affirmatively refute his allegations. Copeland alleges that he pled guilty because his attorney told him his maximum sentence was 7 years in prison, but Copeland acknowledged at the hearing that that the Court could impose a sentence of up to the maximum term of 27 years in prison. Copeland alleges that he pled guilty because his attorney told him his sentence would be in the range of 60 months, but he acknowledged at the hearing that his sentence could be more severe than any sentence estimated by his attorney, and that he was not relying on any promise of a low sentence. Copeland alleges that he pled guilty because his attorney failed to explain how his Guidelines range would be calculated, but Copeland stated at the hearing that he and his attorney had discussed the Sentencing Guidelines. Moreover, as noted above, Copeland stated that he wished to plead guilty even after acknowledging that the Court could impose up to the cumulative maximum sentence of 27 years in prison, and that his sentence could be more severe than any estimate given by his attorney. Thus,

counsel's alleged failure to explain how his Guidelines range would be calculated, even if true, could not have affected his decision to plead guilty. Finally, Copeland alleged that he pled guilty because his attorney told him that counsel and the government had reached a verbal agreement about the sentence, but Copeland affirmed under oath that he was not relying on any promises or understandings outside the terms of the Plea Agreement.

"Solemn declarations in open court," such as the ones Copeland made when he pled guilty, "carry a strong presumption of verity." Blackledge v. Allison, 431 U.S. 63, 74 (1977). "[T]he representations of the defendant, his lawyer, and the prosecutor at [a plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings." Id. at 73-74. Given that Copeland's statements at the change-of-plea colloquy were made under oath, "he bears a heavy burden to show his statements were false." United States v. Rogers, 848 F.2d 166, 168 (11th Cir. 1988) (per curiam). Based on the foregoing record, Copeland has not carried that heavy burden. Copeland made specific assurances during the change-of-plea hearing that refute his allegations. As such, Copeland is not entitled to relief on Ground One.

## B. Ground Two

Next, Copeland argues that counsel gave ineffective assistance at the sentencing hearing by failing to object to a violation of the Ex Post Facto Clause.[6] At both the initial sentencing hearing and the resentencing hearing, the Court applied the 2011 Guidelines manual, which was the manual in effect on the date of the original sentencing. See Revised

---

[6]    U.S. Const., Art. I, § 9, cl. 3 ("No Bill of Attainder or ex post facto Law shall be passed.").

PSR at ¶ 36. Copeland argues that the Court should have used the 2008 Guidelines manual – the manual in effect on August 21, 2009, when Copeland claims his offense conduct ended. Memorandum at 12. According to Copeland, applying the later Guidelines manual violated the Ex Post Facto Clause because, beginning November 1, 2009, the definition of a "victim" under U.S.S.G. § 2B1.1 was broadened to include "any individual whose means of identification was used unlawfully or without authority." U.S.S.G. § 2B1.1, Application Note 4(E) (2009); see also U.S.S.G., App'x C, Amendment 726 (2009). Before November 1, 2009, a "victim" was defined as "(A) any person who sustained any part of the actual loss determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense." U.S.S.G. § 2B1.1, Application Note 1 (2008). Copeland argues that without the expanded definition of a "victim," the Court could not have imposed the 6-level 250-victim enhancement under U.S.S.G. § 2B1.1(b)(2)(C). According to Copeland, the 2008 Guidelines would have recognized only one victim: the IRS. Supplemental Reply at 7-8. Copeland argues that counsel should have objected to the Ex Post Facto violation, and had counsel done so, Copeland's sentence would have been lower because the 6-level enhancement would have been eliminated. Id. at 7-9.[7]

Relief as to this ground is due to be denied. Copeland's argument depends on the incorrect assumption that his offense conduct ended on August 21, 2009 – when a co-conspirator named Terry Venson ("TV") deposited a fraudulent tax refund into Venson's SunTrust bank account[8] – and thus that counsel should have argued that the 2008

---

[7]     The Court accepts, for the sake of argument, that Copeland would not have qualified for the 250-victim enhancement without the expanded definition of a "victim." The Court relied on the broadened definition of a "victim" in § 2B1.1, Application Note 4(E) to sustain the 250-victim enhancement. (Crim. Doc. 146; Resentencing Tr., Vol. I at 30)

[8]     See Indictment at 6; Plea Agreement at 24-25.

14

Guidelines applied. But this assumption is contrary to the charge in the Indictment and the facts admitted by Copeland's guilty plea, both of which state that <u>Copeland's</u> offenses continued until December 28, 2009, or January 2010, both after the 2009 Guidelines manual went into effect (with its expanded definition of a "victim").

Ordinarily, "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced." U.S.S.G. § 1B1.11(a). However, in <u>Peugh v. United States</u>, the Supreme Court held that "when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense," the Ex Post Facto Clause is violated. 569 U.S. 530, 533 (2013). Thus, "[i]f the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the <u>ex post facto</u> clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." U.S.S.G. § 1B1.11(b)(1).

But frequently a defendant's crimes span several years, as they did here. In those cases, how does a court determine which "Guidelines Manual [was] in effect on the date that the offense of conviction was committed?" <u>Id.</u> The question matters because the Guidelines instruct that a district court must apply "[t]he Guidelines Manual in effect on a particular date … in its entirety. The court shall not apply, for example, one guideline section from one edition of the Guidelines Manual and another guideline section from a different edition of the Guidelines Manual." <u>Id.</u>, § 1B1.11(b)(2); <u>United States v. Corrado</u>, 53 F.3d 620, 623 (3d Cir. 1995) (the practice of applying only one version of the guidelines

when calculating a defendant's sentence is called the "one book rule.").[9] Not surprisingly, the Guidelines provide the answer:

> Under subsection (b)(1), <u>the last date of the offense of conviction</u> is the controlling date for ex post facto purposes. For example, if the offense of conviction (i.e., the conduct charged in the count of the indictment or information of which the defendant was convicted) was determined by the court to have been committed between October 15, 1991 and October 28, 1991, the date of October 28, 1991 is the controlling date for ex post facto purposes. This is true even if the defendant's conduct relevant to the determination of the guideline range under § 1B1.3 (Relevant Conduct) included an act that occurred on November 2, 1991 (after a revised Guidelines Manual took effect).

U.S.S.G. § 1B1.11, Application Note 2 (emphasis added). Thus, for Ex Post Facto purposes, a court is required to look to the Guidelines applicable to the last date of the conduct for which the defendant was charged and convicted, but not consider the date of merely relevant conduct.

Additionally, "[i]f the defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the Guidelines Manual became effective, the revised edition of the Guidelines Manual is to be applied to both offenses." U.S.S.G. § 1B1.11(b)(3). This is so "even if the revised edition results in an increased penalty for the first offense." U.S.S.G. 1B1.11, Application Note 2, Subsection (b)(3). The commentary explains why applying the revised Guidelines edition to the earlier offense does not violate the Ex Post Facto Clause:

> Because the defendant completed the second offense after the amendment to the guidelines took effect, the ex post facto clause does not prevent determining the sentence for that count based on the amended guidelines. For example, if a defendant pleads guilty to a single count of embezzlement that occurred after the most recent edition of the Guidelines Manual became

---

[9]      There is a limited exception to what is commonly referred to as the "one book rule," which is not applicable here: "[I]f a court applies an earlier edition of the Guidelines Manual, the court shall consider subsequent amendments, to the extent that such amendments are <u>clarifying rather than substantive</u> changes." U.S.S.G. § 1B1.11(b)(2) (emphasis added).

effective, the guideline range applicable in sentencing will encompass any relevant conduct (e.g., related embezzlement offenses that may have occurred prior to the effective date of the guideline amendments) for the offense of conviction. The same would be true for a defendant convicted of two counts of embezzlement, one committed before the amendments were enacted, and the second after. In this example, the ex post facto clause would not bar application of the amended guideline to the first conviction; a contrary conclusion would mean that such defendant was subject to a lower guideline range than if convicted only of the second offense. Decisions from several appellate courts addressing the analogous situation of the constitutionality of counting pre-guidelines criminal activity as relevant conduct for a guidelines sentence support this approach. See United States v. Ykema, 887 F.2d 697 (6th Cir. 1989) (upholding inclusion of pre-November 1, 1987, drug quantities as relevant conduct for the count of conviction, noting that habitual offender statutes routinely augment punishment for an offense of conviction based on acts committed before a law is passed); United States v. Allen, 886 F.2d 143 (8th Cir. 1989) (similar); see also United States v. Cusack, 901 F.2d 29 (4th Cir. 1990) (similar).

U.S.S.G. § 1B1.11, Application Note 2, Subsection (b)(3).

Nearly every circuit court of appeals, including the Eleventh Circuit, has held that applying the Guidelines in the manner instructed does not offend the Ex Post Facto Clause, even if it means applying a harsher Guidelines manual to earlier offenses, so long as the offenses are grouped together under § 3D1.2. United States v. Bailey, 123 F.3d 1381, 1403-07 (11th Cir. 1997). See also United States v. Pagan-Ferrer, 736 F.3d 573, 595-99 (1st Cir. 2013); United States v. Kumar, 617 F.3d 612, 626–28 (2d Cir. 2010) ("We conclude that the one-book rule set forth in § 1B1.11(b)(3) does not violate the Ex Post Facto clause when applied to the sentencing of offenses committed both before and after the publication of a revised version of the Guidelines.") (emphasis omitted); United States v. Duane, 533 F.3d 441, 449 (6th Cir. 2008) ("[W]here, as here, offenses grouped together for sentencing purposes were committed before and after an amended version of the Guidelines went into effect, the use of the amended version of the Guidelines does not violate the Ex Post Facto Clause."); United States v. Sullivan, 255 F.3d 1256, 1262–63

(10th Cir. 2001) (same); United States v. Lewis, 235 F.3d 215, 218 (4th Cir. 2000) ("[I]t was not § 1B1.11(b)(3) that disadvantaged Lewis, but rather her decision to commit further acts of tax evasion after the effective date of the 1993 guidelines."); United States v. Vivit, 214 F.3d 908, 918–19 (7th Cir. 2000) ("[W]e believe that the enactment of the grouping rules provides fair notice such that the application of §§ 1B1.11(b)(3) and 3D1.2 does not violate the Ex Post Facto Clause."); United States v. Kimler, 167 F.3d 889, 893–95 (5th Cir. 1999) ("[A] defendant has notice that the version of the sentencing guidelines in effect at the time he committed the last of a series of grouped offenses will apply to the entire group."); United States v. Cooper, 35 F.3d 1248, 1250–53 (8th Cir. 1994), vacated, 514 U.S. 1094, 115 S.Ct. 1820, 131 L.Ed.2d 742 (1995), reinstated, 63 F.3d 761, 762 (8th Cir. 1995) (per curiam) (same). But see United States v. Ortland, 109 F.3d 539, 546–47 (9th Cir. 1997) (finding Ex Post Facto violation where district court applied revised Guidelines to all five mail fraud counts, only one of which involved conduct committed after the amendment). The Eleventh Circuit has reasoned:

> …[T]he one book rule, together with the Guidelines grouping rules and relevant conduct, provide that related offenses committed in a series will be sentenced together under the Sentencing Guidelines Manual in effect at the end of the series. Thus, a defendant knows, when he continues to commit related crimes, that he risks sentencing for all of his offenses under the latest, amended Sentencing Guidelines Manual. Analogous to a continuous criminal offense, like conspiracy, the one book rule provides notice that otherwise discrete criminal acts will be sentenced together under the Guidelines in effect at the time of the last of those acts.

Bailey, 123 F.3d at 1404–05 (footnotes omitted).

Here, no Ex Post Facto violation resulted from applying the guidelines from the 2011 Guidelines manual because Copeland's offenses continued past November 1, 2009, when the Guidelines broadened the definition of the term "victim" to include "any individual

whose means of identification was used unlawfully or without authority." U.S.S.G. § 2B1.1, Application Note 4(E) (2009). Copeland wrongly assumes that his offense conduct ended on August 21, 2009, such that the 2008 Guidelines manual should have governed his conduct. But the Indictment and the guilty plea refute this premise.

According to Count Twenty-Seven of the Indictment, Copeland engaged in a scheme or artifice to defraud that began June 29, 2007, and continued through December 28, 2009. Indictment at 4. During that time, Copeland allegedly: (1) "used the identity information of other individuals," without their knowledge or permission, "to file and cause the filing of … fraudulent federal income tax returns"; (2) used interstate wires to file fraudulent tax returns; (3) caused other individuals to open bank accounts into which fraudulent tax refunds were deposited; (4) obtained the fraudulent deposits from other co-conspirators' bank accounts; (5) "obtained funds which had as their source false and fraudulent income tax refunds generated by the scheme [ ] by cashing checks through" one of Copeland's businesses, Capital Auto Sales; and (6) "used funds generated by the scheme to purchase and cause the purchase of used automobiles, which were then offered for sale at" one of his other businesses, New Era Auto Sales. Id. at 2-3 (describing the manner and means of the scheme to defraud); id. at 5 (incorporating the manner and means with respect to Counts Twelve through Twenty-Seven). Thus, according to the Indictment, this scheme to defraud continued through December 28, 2009.

According to the Plea Agreement and Copeland's sworn statements at the plea hearing, the crimes continued into January 2010. With respect to the personalization of the elements for Count Twenty-Seven, Copeland admitted that from May 19, 2006, through January 2010, he "knowingly devise[d] or participate[d] in a scheme to defraud the Internal

Revenue Service (IRS), or to obtain money from the IRS by using false pretenses, representations, or promises." Plea Agreement at 20; Plea Tr. at 33. With respect to the personalization of the elements for Count Thirty-Six, Copeland admitted that from May 19, 2006, through January 2010, he knowingly used or possessed other individuals' means of identification, without lawful authority to do so, in relation to his scheme to defraud the IRS. Plea Agreement at 21; Plea Tr. at 34. According to the factual basis, "[b]etween in or about May 19, 2006, and continuing through in or about January 2010, at Jacksonville, Florida and elsewhere, the defendant, Bryan Adrain Copeland, engaged in a scheme to defraud the Internal Revenue Service (IRS)...." Plea Agreement at 23; Plea Tr. at 28. Additionally, the factual basis included in Copeland's Plea Agreement, which Copeland admitted was true in its entirety, stated:

> On February 3, 2010, agents from USSS [United States Secret Service], USPIS [United States Postal Inspection Service], and IRS/CI [IRS Criminal Investigations] conducted surveillance at the defendant's residence and place of business. USSS agents observed the defendant leave his business, and followed him. He drove towards the Dames Point Bridge in Jacksonville [Florida] and began driving erratically, which caused one of the agents following him to activate the agent's vehicle's lights and sirens. At that point, the agents observed the defendant throw two backpacks out of his vehicle. The backpacks landed on the bridge and were recovered by an agent.
>
> After the defendant drove over the bridge, the USSS agent pursuing the defendant caused him to stop. The defendant consented to a search of his vehicle, which revealed numerous items of evidentiary value, including IRS documents and debit and ATM cards in the names of other coconspirators.
>
> A search of the two backpacks abandoned by the defendant also revealed items of evidentiary value, including laptop computers, and thumb drives, bank paperwork and additional IRS forms. A forensic examination of the laptop computers established that the computers contained IRS forms and had been used to create income tax returns for other people.

Plea Agreement at 25; Plea Tr. at 30-31, 33. Thus, the factual basis illustrates that the offenses of conviction continued well after November 1, 2009, when the 2009 Guidelines manual went into effect.

In United States v. Elbeblawy, the Eleventh Circuit found that a district court did not clearly err, for Ex Post Facto purposes, when it found that the defendant's conduct continued after 2011, when the Guidelines were amended to provide a 4-level increase for certain federal healthcare offenses. 899 F.3d 925, 939 (11th Cir. 2018). The Eleventh Circuit pointed to the factual basis signed by the defendant, which "expressly provided that his 'primary role in the scheme [to defraud] … was to establish and take control of JEM … (from approximately 2006-2011) and Healthy Choice … (from approximately 2009-2013).'" Id. (emphasis omitted). The court found that "[t]his evidence alone establishes that Elbeblawy's criminal conduct continued after 2011." Id. Likewise, the signed Plea Agreement and the factual basis, which Copeland accepted as true at the change-of-plea hearing, state that his offenses continued through January 2010. "This evidence alone establishes that [Copeland's] criminal conduct continued after [November 1, 2009]." Id.

Because Copeland admitted that the conduct supporting Count Twenty-Seven (wire fraud) continued until January 2010, this "is the controlling date for ex post facto purposes."[10] U.S.S.G. § 1B1.11, Application Note 2. Thus, pursuant to § 1B1.11(b)(3), the 2009 Guidelines manual applied to Counts Twenty-Seven and Thirty-Seven, which the Probation Officer grouped together under § 3D1.2(d). Revised PSR at ¶ 37.[11] Consistent

---

[10]     Copeland also admitted that his conduct regarding Count Thirty-Six continued through January 2010. However, Count Thirty-Six, with a mandatory consecutive two-year sentence, was grouped separately and not affected by the 250-victim enhancement. Revised PSR at ¶¶ 38-39.

[11]     With regard to Count Thirty-Seven (making false claims against the United States), Copeland only admitted that his conduct took place on August 21, 2009. Plea Agreement at 21; Plea Tr. at 35. However, Counts Twenty-Seven and Thirty-Seven were grouped together under

with Eleventh Circuit precedent, the Court finds that applying the latest Guidelines manual to grouped offenses such as these does not violate the Ex Post Facto Clause. Bailey, 123 F.3d at 1403-07. "[T]he one book rule," together with the grouping rules, "provide[ ] notice that otherwise discrete criminal acts will be sentenced together under the Guidelines in effect at the time of the last of those acts." Id. at 1405. "Thus, a defendant knows, when he continues to commit related crimes, that he risks sentencing for all of his offenses under the latest, amended Sentencing Guidelines Manual." Id. When Copeland continued his offense conduct into 2010, he assumed the risk that all of his related criminal conduct would be sentenced under the 2009 Guidelines manual, including its broadened definition of the term "victim."

Since there was no difference between the 2011 Guidelines manual, which the Court utilized, and the 2009 Guidelines manual as it pertained to the definition of a "victim,"[12] no Ex Post Facto violation resulted from using the 2011 manual. As such, Copeland's attorney was not ineffective for not objecting to the 250-victim enhancement on Ex Post Facto grounds. "A lawyer cannot be deficient for failing to raise a meritless claim." Freeman v. Att'y General, 536 F.3d 1225, 1233 (11th Cir. 2008) (citing Chandler v. Moore, 240 F.3d 907, 917 (11th Cir. 2001)). Of course, diligent attorneys should remain vigilant for Ex Post Facto concerns at sentencing because of two realities: Guidelines frequently undergo revisions from one year to the next and defendants are often sentenced

---

U.S.S.G. § 3D1.2(d) "because the offense level is determined largely on the basis of the total amount of loss and the offense guideline is written to cover such behavior." Revised PSR at ¶ 37. Copeland has not challenged the grouping of the offenses under § 3D1.2.

[12]  Compare U.S.S.G. § 2B1.1, Application Note 4(E) (2011) with U.S.S.G. § 2B1.1, Application Note 4(E) (2009).

years after their offense conduct ended. However, based on the facts of this case, the application of the 6-level 250-victim enhancement did not violate the Ex Post Facto Clause.

## C. Ground Three

In Ground Three, Copeland asserts that counsel gave ineffective assistance at sentencing by not objecting to an 18-level enhancement under U.S.S.G. § 2B1.1(b)(1)(J), based on a loss amount of more than $2.5 million but not more than $7 million. Copeland alleged "that the court's determination of [the] loss [amount] was vastly exaggerated" and that counsel "should have objected to the $3.5 million estimate because the estimate was unreliable." Motion to Vacate at 7. However, Copeland provided no additional facts supporting this contention in his Motion to Vacate or Memorandum. See Motion to Vacate at 7; Memorandum at 13. More importantly, Copeland abandons this ground in his Supplemental Reply. There, he states:

> Petitioner argued that the amount of loss in this case should have been less than $5,058,2797.26 [sic] (PSR ¶ 41), and that counsel was ineffective for failing to object to that finding. Under § 2B1.1(b)(1)(J), a defendant will receive an 18-level enhancement if the amount of loss was more than $2.5 million, but not more than $7 million. Here, the actual loss to the IRS was $3,547,373.67 (see, PSR ¶ 32), which falls under § 2B1.1(b)(1)(J). Thus, Petitioner has difficulty demonstrating prejudice under Strickland because a successful objection would not have eliminated the 18-level enhancement.

Supplemental Reply at 11-12. See also Reply at 10 n.1. In so stating, Copeland concedes that he cannot prevail on Ground Three.[13] Accordingly, the Court deems Ground Three withdrawn.

---

[13] The Court agrees. Because Copeland has offered no reason why, at a minimum, $3,547,373.67 would have been an inaccurate calculation of the loss amount, he cannot prevail. See Revised PSR at ¶ 28 ("The Internal Revenue Service paid $3,547,373.67 in fraudulent claims.").

### D. Ground Four

Finally, Copeland contends that counsel gave ineffective assistance at his resentencing because counsel "failed to request a downward departure" based on post-sentencing rehabilitation. Motion to Vacate at 8. Copeland asserts that "[h]ad counsel notified the court of Petitioner's post-offense rehabilitative efforts and good conduct while he had been incarcerated following the original 2012 sentencing, the court would have been <u>required</u> to assess that good conduct under 18 U.S.C. § 3553(a), and Petitioner would have received a lower sentence." <u>Id.</u> (emphasis added). The United States counters that under <u>United States v. Mesa</u>, 247 F.3d 1165 (11th Cir. 2001), and <u>United States v. Pickering</u>, 178 F.3d 1168 (11th Cir. 1999), a departure for post-sentencing rehabilitation can only be applied along the criminal history axis, and since Copeland was already in Criminal History Category I, he could not have benefited from consideration of post-sentencing rehabilitation. Supplemental Response at 8-9.

It is true that in <u>Mesa</u> and <u>Pickering</u>, the Eleventh Circuit explained "that a prisoner's efforts at rehabilitation 'reflect more strongly on the offender's rehabilitative potential and likelihood of recidivism.'" <u>Mesa</u>, 247 F.3d at 1171 (quoting <u>Pickering</u>, 178 F.3d at 1175). As such, the court in <u>Mesa</u> "concluded … that any 'departure for post-offense rehabilitation must occur along that (the criminal history) axis.' So we specifically rejected Offense Level adjustment [sic] for post-offense rehabilitation." <u>Id.</u> (internal citation omitted) (quoting <u>Pickering</u>, 178 F.3d at 1175). Here, because Copeland was already in Criminal History Category I, <u>Mesa</u> and <u>Pickering</u> would have foreclosed Copeland from receiving a <u>Guidelines departure</u> based on post-sentencing rehabilitation. However, despite his imprecise use of the phrase "downward departure," Copeland does not really seem to

argue that counsel should have moved for a <u>Guidelines departure</u> based on post-sentencing rehabilitation. Rather, Copeland appears to argue that counsel was ineffective because he failed to seek a <u>variance</u> under the § 3553(a) factors based on post-sentencing rehabilitation. <u>See</u> Motion to Vacate at 8 (citing 18 U.S.C. § 3553(a)). This is a different argument, because a Guidelines departure and a variance are not the same thing. "The difference between the two is that a downward departure implicates the calculation of the guidelines range while a downward variance invokes the district court's discretion to impose a sentence below the calculated guidelines range based on the factors set forth in 18 U.S.C. § 3553(a)." <u>United States v. Clay</u>, 562 F. App'x 919, 921 n.2 (11th Cir. 2014) (citing <u>United States v. Amedeo</u>, 487 F.3d 823, 830 (11th Cir. 2007)).

In <u>Pepper v. United States</u>, the Supreme Court held that under § 3553(a), the "district court at resentencing <u>may</u> consider evidence of the defendant's postsentencing rehabilitation and ... such evidence <u>may</u>, in appropriate cases, support a downward variance from" the advisory guidelines range. 562 U.S. 476, 481 (2011) (emphasis added). But "[t]hat's a double 'may' holding that leaves what consideration, if any, to give to [a defendant's] post-sentencing rehabilitation, if any, up to the district court." <u>United States v. Doyle</u>, 857 F.3d 1115, 1121 (11th Cir. 2017). Thus, contrary to Copeland's argument that "the court would have been <u>required</u> to assess [his alleged] good conduct under 18 U.S.C. § 3553(a)," Motion to Vacate at 8 (emphasis added), the Court would have had broad discretion in deciding whether to consider post-sentencing rehabilitation at all, and if so, whether it should have affected the sentence (if at all).

Here, Copeland has not shown that counsel's performance was deficient or prejudicial with respect to seeking a variance for post-sentencing rehabilitation. For one,

the record refutes Copeland's suggestion that counsel failed to "notif[y] the court of Petitioner's post-offense rehabilitative efforts and good conduct while he had been incarcerated following the original 2012 sentencing…." Motion to Vacate at 8. Before resentencing, counsel submitted a package of materials to the Court, including a "Comprehensive Mitigation Report." (Crim. Doc. 133-1; Mitigation Report). The Mitigation Report advised the Court that:

> While under sentence at the Federal Bureau of Prisons, Mr. Copeland has made an appropriate adjustment to his imprisonment, and has otherwise been a model prisoner. According to the presentence report, Mr. Copeland has no history of institutional misconduct (PSR 12). Mr. Copeland stated that he has endeavored to use his time in the BOP as productively as possible. He added that he has taken courses in parenting skills, Spanish, and the science of ancient shipbuilding.

Id. at 2. Moreover, Copeland told the Court in allocution that since being incarcerated, he had been trying to better himself by taking classes and learning Spanish so that he could get a job upon his release. Resentencing Tr. Vol. II at 44. When the Court explained how it crafted the sentence, the Court told Copeland that "so long as you continue to behave within the Bureau of Prisons, which I have every reason to believe that you will, that means that you would have about 12 years left." Id. at 53-54. Thus, while counsel did not specifically argue for a variance based on post-sentencing rehabilitation, the record shows that the Court was made aware of Copeland's rehabilitative efforts while in custody.

Additionally, Copeland has not established a reasonable probability that, had counsel specifically argued for a variance based on post-sentencing rehabilitation, the Court would have varied below the Guidelines range even more than it did. Copeland's overall sentence of 204 months in prison already represented a downward variance of nearly five years, despite the Court viewing Copeland's crimes as very serious offenses.

See id. at 46-55. The Court observed that "[i]t really cannot be emphasized how serious this offense was." Id. at 48. Copeland orchestrated a sprawling and sophisticated scheme to defraud the IRS, which involved numerous co-conspirators, the creation of false documents, identity theft, and the theft of $3.5 million over four years (in addition to obstruction of justice). See id. at 48-51. The low end of Copeland's Guidelines range was effectively 259 months in prison (235 months plus a mandatory consecutive 24 months). Id. at 51. Nevertheless, the Court varied 55 months below the Guidelines range when it sentenced Copeland to a total term of 204 months in prison. Given the severity of the offense, Copeland has failed to show a reasonable likelihood that the Court would have varied even further below the Guidelines range based on post-sentencing rehabilitation, especially considering that the Court was already aware of Copeland's efforts at rehabilitation while in prison.

Upon a thorough review of the record, the Court is of the view that Copeland's counsel did an effective job representing him at resentencing, as reflected by the fact that he obtained a significant downward variance and a substantial reduction in Copeland's sentence compared to the initial sentencing hearing. That counsel chose to focus his arguments on issues other than post-sentencing rehabilitation is not a decision the Court can deem unreasonable, especially given that there is no guarantee post-sentencing rehabilitation will support a lower sentence. See Pepper, 562 U.S. at 505 n.17 ("Of course, we do not mean to imply that a district court must reduce a defendant's sentence upon any showing of postsentencing rehabilitation."); Doyle, 857 F.3d at 1121 (Pepper's holding "leaves what consideration, if any, to give to [a defendant's] post-sentencing rehabilitation, if any, up to the district court."). Counsel focused on other issues, such as challenging a

duplicative Guidelines enhancement based on the number of vulnerable victims, <u>see</u> Resentencing Tr., Vol. I at 7-8, and urging the Court to give Copeland credit for acceptance of responsibility, <u>id.</u> at 33-38. These were strategic choices about what to emphasize at the resentencing hearing, and the Court declines to second-guess those choices. <u>See</u> <u>Blankenship v. Hall</u>, 542 F.3d 1253, 1280 (11th Cir. 2008) ("Counsel made a reasonable strategic choice to pursue a lingering doubt strategy, and we do not second-guess that decision.") (citing <u>Strickland</u>, 466 U.S. at 690-91); <u>Chandler v. United States</u>, 218 F.3d 1305, 1314 n.14 (11th Cir. 2000) ("And, a court must not second-guess counsel's strategy.") (citing <u>Waters v. Thomas</u>, 46 F.3d 1506, 1518-19 (11th Cir. 1995) (en banc)). Because the Court finds that counsel's performance with respect to the issue of post-sentencing rehabilitation was neither deficient nor prejudicial, Ground Four is due to be denied.

### III.    Certificate of Appealability

The undersigned opines that a certificate of appealability is not warranted. This Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Copeland "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," <u>Tennard v. Dretke</u>, 542 U.S. 274, 282 (2004) (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335–36 (2003) (quoting <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 n.4 (1983)).

Where a district court has rejected a petitioner's claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the claims debatable or wrong. See Slack, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. Upon consideration of the record as a whole, this Court will deny a certificate of appealability.

As such, and in accordance with the Rules Governing Section 2255 Cases in the United States District Courts, it is hereby **ORDERED:**

1. Petitioner Bryan Adrain Copeland's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (Civ. Doc. 1) is **DENIED**.

2. The Clerk is directed to enter judgment in favor of the United States and against Copeland, and close the file.

3. If Copeland appeals the denial of the petition, the Court denies a certificate of appealability. Because this Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

**DONE AND ORDERED** at Jacksonville, Florida this 3rd day of July, 2019.

MARCIA MORALES HOWARD
United States District Judge

lc 19

Copies:
Counsel of record
Petitioner